**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

MONIQUE MORRIS AS ADMINISTRATRIX
OF THE ESTATE OF LISA HELENE MORRIS,
               Plaintiff


        v.                                         C.A. No. 13-304-ML


RHODE ISLAND HOSPITAL and
LUCIALINA M. GOMES, R.N.,
               Defendants


**MEMORANDUM AND ORDER**

The plaintiff, Monique Morris ("Morris"), as administratrix of the estate of Lisa Helene Morris ("Mrs. Morris"), Morris's deceased mother, has brought claims of medical malpractice and wrongful death against the defendants Rhode Island Hospital ("RIH") and Lucialina M. Gomes, RN ("Nurse Gomes," together with RIH, the "Defendants"), the nurse who attended Mrs. Morris while she was hospitalized at RIH. Complaint (Dkt. No. 1). The case is before the Court on the Defendants' motions to exclude (1) expert testimony of Morris's expert William Pogue, MD (Dkt. No. 44), and (2) expert testimony of Morris's nursing expert Cecristal Umeugo, RN, BSN, JD.(Dkt. No. 43).

## I. Factual Background and Procedural History

The decedent, Mrs. Morris, suffered from Stage IV mucinous

adenocarcinoma of the appendix, a cancer that was both recurring and terminal. Mrs. Morris underwent a number of extensive surgeries for the cancer, as well as chemotherapy; she had also been diagnosed with a number of other serious co-occurring conditions. On January 3, 2011, Mrs. Morris was admitted to RIH for elective surgery to remove a large abdominal tumor. Complaint ¶¶ 7, 9. According to the Complaint, Mrs. Morris had tolerated the two-hour procedure and was recovering well as an inpatient at RIH. Complaint ¶ 9.

On January 8, 2011, at 11:00 a.m., Mrs. Morris spilled water on her bed and operated the call button for the nurse. Complaint ¶ 10. The Complaint alleges that Nurse Gomes responded to the call; placed Mrs. Morris in a seated position on the edge of the bed; and left her unattended while Nurse Gomes fetched a new bed sheet and/or disposed of towels she had used to mop water off the floor. Id. According to the Complaint, Mrs. Morris then fell and hit her head on a rolling metal table. Id. Mrs. Morris was found by the returning Nurse Gomes as the patient was lying face-down on the floor with a cut on her forehead. Id. At first, Mrs. Morris was able to verbalize that she was nauseated, then she became unresponsive. Complaint ¶ 13. Advanced cardiac life support was initiated, but Mrs. Morris was pronounced dead at approximately 12:00 p.m. Complaint ¶ 11.

2

On October 4, 2012, Morris filed suit against RIH and Gomes in the U.S. District Court for the District of Connecticut.[1] The Complaint alleges that the Defendants were careless in leaving Mrs. Morris unattended and that the care she received "deviated from the degree of care and skill exercised by medical providers and nurses." Complaint ¶ 19. According to the Complaint, Mrs. Morris's estate expended large sums for her funeral, related travel expenses, and administration of the estate. Complaint ¶ 27. It is also alleged that, prior to her death, Mrs. Morris suffered pain and mental anguish from the onset of the symptoms until the moment she became unconscious and subsequently expired. Complaint ¶ 28.

On December 21, 2012, the Defendants sought dismissal of the Complaint on the ground that neither of the Defendants was subject to personal jurisdiction in Connecticut. (Dkt. No. 12). In the alternative, the Defendants requested that the case be transferred to this Court. Morris objected to dismissal or removal of the case, and the parties were advised by the Connecticut District Court that, in any event, they were obliged to conduct discovery. (Dkt. Entry January 7, 2013).

---

[1]

Morris resides in Connecticut; Mrs. Morris was a Connecticut resident at the time of her death. RIH is a Rhode Island corporation and Nurse Gomes is a resident of Rhode Island where she is licensed to practice nursing. (Dkt. No. 13).

On April 12, 2013, the Defendants' motion was granted and the case was transferred to this Court. (Dkt. Entry April 12, 2013). Following a status conference and issuance of a pretrial scheduling order by this Court (Dkt. No. 33), the parties conducted discovery.

On May 5, 2014, the Defendants filed a motion to exclude the expert testimony of Morris's nursing expert Cecrystal Umeugo, RN, BSN, JD ("Umeugo"). (Dkt. No. 43). The Defendants sought to exclude Umeugo's testimony on the ground that Umeugo is precluded from serving as an expert because Umeugo's compensation is contingent on the outcome in this case. Umeugo is a registered nurse as well as a practicing attorney at Umeugo & Associates, P.C., the law firm which is representing Morris and which is owned by Umeugo's father.

On the same date, the Defendants also sought exclusion of Morris's other expert witness, Dr. William Pogue, MD ("Dr. Pogue"). (Dkt. No. 44). Dr. Pogue provided an opinion letter to Morris, in which he states that leaving Mrs. Morris unattended "even for the short time it took for the trip to the laundry hamper, constituted a serious breach of the standard of care for this patient." (Dkt. No. 1, page 15 of 19). According to the Defendants' memorandum in support of their motion, Dr. Pogue is not competent to provide an opinion as to the nursing standard of

care because he does not have the requisite training, education, or experience. Defs.' Mem. at 5.(Dkt. No. 44). Likewise, the Defendants asserted that Dr. Pogue has no expertise in pathology and that the cause of death opinion he has rendered does not relate to hematology or oncology, which are Dr. Pogue's areas of expertise.

In response to Defendants' motion to preclude Umeugo's expert testimony, Morris represented that Umeugo "did not agree to a contingent stipulation as to the amount of payment that she would paid [sic] for reviewing the file, writing an expert opinion, and testifying." Pltf.'s Obj. at 3 (Dkt. No. 47-1). According to Umeugo's testimony at her March 13, 2014 deposition, Umeugo "fully intend[ed] on billing the client, regardless of the outcome," and "her billing would occur when the case came to fruition or ended." Id. at 3-4; Depo. Tr. at 40-41 (Dkt. No. 47-2). Umeugo further explained that she intended to bill the client when the case was over and that she would bill out of the proceeds of the case because the "Plaintiff may decide to pay out of the Plaintiff's recovery or from her personal savings or may borrow money to pay for the said expert fees." Id. at 4.

With respect to Defendants' motion to preclude Dr. Pogue from rendering an expert opinion, Morris suggested that Dr. Pogue was qualified to render an opinion on nursing standards because,

*inter alia*, "he has spent extensive time in a hospital setting in which he has observed nurses and the care they deliver." Pltf.'s Obj. at 4 (Dkt. No. 48-1).

As to the cause-of-death opinion, Morris explained that "Dr. Pogue proposed to testify concerning the fact that the fall that [Mrs. Morris] suffered due to the negligence of the Defendants was caused by a physiological condition and that the actual striking of the head on the floor precipitated the events that caused the cardiopulmonary compromise and eventual death of [Mrs. Morris]." Id. at 6. Morris further asserted that "Dr. Pogue's theory of causation is not based on unknown and novel scientific findings," and she pointed out that "[d]uring his deposition, [Dr. Pogue] plainly stated that severe hypotension with acute myocardial infarction could not be ruled in or out because [Mrs. Morris's] blood pressure was unknown at the time she fell." Id.

On June 3, 2014, the Court conducted a final pretrial conference with the parties. (Docket Entry June 3, 2014). At the conference, Morris's counsel acknowledged that Umeugo had rendered an expert opinion for which she had not yet billed Morris. At that time, the Court advised the parties that it would permit Defendants' counsel to conduct a *voir dire* of Umeugo, which would be conducted prior to trial. Because the Court also

deemed it appropriate to conduct a _Daubert_[2] inquiry of Dr. Pogue in advance of trial, a hearing on both matters was set for June 10, 2013.

As indicated by Defendants' counsel during the June 3, 2014 conference, the Defendants issued a subpoena _duces tecum_ to Umeugo & Associates, P.C. on the following day, requesting information related to charges by Umeugo for expert services provided to another client represented by the firm. On June 9, 2014, Umeugo & Associates, P.C. filed a motion to quash the subpoena, (Dkt. No. 60-1 at 2), on the grounds that (1) Umeugo was not an attorney at the time she rendered those services, nor was she an employee of her father's firm; and (2) the firm "does not have any document or agreement with [Umeugo] that was contingent and/or depended on the outcome of any case." Id.

On June 10, 2014, the Court conducted an all-day hearing to establish (1) whether Dr. Pogue qualified as an expert witness under _Daubert_, and (2) whether Umeugo should be precluded from testifying as an expert witness because her compensation was contingent on the outcome of the case.

Within a week of the June 10, 2014 hearing, the Defendants filed supplemental memoranda in support of their motions. (Dkt.

---

2

    _Daubert v. Merrell Dow Pharm., Inc._, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Nos. 66, 67). With regard to Umeugo's proposed expert testimony, the Defendants maintain that Umeugo's compensation is contingent upon the successful resolution of this case. Defs.' Supp. Mem. at 3 (Dkt. No. 67). The Defendants also assert that Umeugo should be precluded from testifying because doing so would violate conflict-of-interest rules. Id. 5-6. Regarding Dr. Pogue, the Defendants reiterate that Dr. Pogue is not qualified to render an opinion on the cause of Morris's death, *e.g.*, because he lacks the requisite education, training, or experience in the field of pathology. Defs.' Supp. Mem. at 3 (Dkt. No. 66). The Defendants also note that Dr. Pogue did not provide a standard-of-care opinion at the June 10, 2014 hearing, and that he has no education, training, or experience in nursing. Id. at 4.

On June 24, 2014, Morris filed supplemental responses to Defendants' motions. Regarding Dr. Pogue's qualifications and ability to render opinions on the cause of Morris's death and on the standard of nursing care Mrs. Morris received at RIH, Morris maintains that (1) Dr. Pogue need not be a pathologist or have performed an autopsy to render an opinion on the cause of death, Pltf.'s Supp. Mem at 3. (Dkt. No. 68); and (2) Dr. Pogue's experience in fall risk and giving lectures to nurses qualifies him to offer a standard of care opinion. Id. at 5.

With respect to Umeugo's proposed testimony, Morris asserts

that (1) Umeugo's fees are not contingent on the outcome of this case—Umeugo has now billed Morris and has been paid for her work performed thus far, Pltf.'s Supp. Mem. at 1-2; (2) Umeugo "is not an attorney of the firm representing the Plaintiff,"[3] id. at 1; and (3) Umeugo's testimony is not precluded by the rules of professional conduct. Id. at 6.

## II. Standard of Review

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, Fed. R. Evid. 702.[4] The

---

[3]  Although Umeugo herself testified that she has been employed by her father's law firm as an attorney for the past three and a half years, the supplemental memorandum more specifically asserts that Umeugo is neither an owner or a partner in the firm, nor does she represent Morris as an attorney. Id. at 5.

[4]  Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

rule provides that a proposed expert witness must be sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be both relevant and reliable. Accordingly, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006)(citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); United States v. Díaz, 300 F.3d 66, 73 (1st Cir.2002)).

Following the directive in Daubert, trial courts perform a gatekeeping role in regulating the admission of expert testimony under Fed. R. Evid. 702. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. at 589-95. That screening function includes a preliminary evaluation of the proffered expert testimony for both reliability and relevance. See Daubert, 509 U.S. at 591-595; Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co., 161 F.3d 77, 80 (1st Cir.1998). The trial court's inquiry under Rule 702 is a "flexible one," Daubert, 509 U.S. at 594, and there is no particular procedure that the trial court is required to follow in executing its gatekeeping function. In evaluating whether expert testimony rests on an adequate foundation, the trial courts have been furnished by the Supreme Court with four general

guidelines:

> (1) whether the theory or technique can be and has been tested;
>
> (2) whether the technique has been subject to peer review and publication;
>
> (3) the technique's known or potential rate of error; and
>
> (4) the level of the theory or technique's acceptance within the relevant discipline.

United States v. Mooney, 315 F.3d 54, 62 (1st Cir.2002) (quoting Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786). However, these factors do not "constitute a definitive checklist or test," and the question of admissibility "must be tied to the particular facts" of a particular case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (internal quotation marks omitted).

In assessing whether proffered expert testimony is reliable, the trial court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. As to relevancy, "expert testimony must be relevant not only in the sense that all evidence must be relevant, see Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to

understand or determine a fact in issue." Ruiz-Troche, 161 F.3d at 81 (citing Daubert, 509 U.S. at 591-92)).

Accordingly, the trial court's responsibility under Rule 702 and Daubert is limited to finding that the expert's conclusion has "a reliable basis in the knowledge and experience of [the expert's] discipline." U.S. v. Vargas, 471 F.3d 255, 265 (1st Cir. 2006)(citing Daubert, 509 U.S. at 592, 113 S.Ct. 2786)); Ruiz-Troche, 161 F.3d at 85 ("[ Daubert ] demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."). However, Daubert does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. Ruiz-Troche, 161 F.3d at 85. Only if the trial court deems the expert's methodology reliable, is the expert allowed to testify as to the inferences and conclusions he draws from it. United States v. Mooney, 315 F.3d at 63 ("We ... note that Rule 702 specifically allows qualified experts to offer their opinions, a testimonial latitude generally unavailable to other witnesses.").

A trial court has broad discretion to admit or exclude expert testimony based on its determination as to the reliability and relevance of the proffered expert testimony. Gen. Elec. Co.

v. Joiner, 522 U.S. 136, 143, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); Hochen v. Bobst Group, Inc., 290 F.3d 446, 452 (1st Cir.2002).

## III. Discussion

### A. Dr. Pogue

In his report, Dr. Pogue offered two opinions, one regarding the cause of Mrs. Morris's death, and a separate opinion regarding the standard of nursing care provided by Nurse Gomes. Pogue Report. Ex. 4 (Dkt. No. 1 at pages 15-17 of 19). With respect to the latter, Dr. Pogue opined that leaving Mrs. Morris unattended, albeit briefly, and/or without a restraining device, constituted a serious breach of the standard of care. Id. at Pages 16-17 of 19.

Regarding the cause of death, Dr. Pogue's report listed a number of "possibilities" that may have caused Mrs. Morris's death. Id. at 16 of 19. Although he acknowledges in his report that Mrs. Morris's "post-mortem examination did not establish a cause of death," Dr. Pogue then continues, "[in the absence of an evident anatomic cause of death, the conclusion must be that an abnormal physiological event caused her death." Id. According to Dr. Pogue, "[s]ome possibilities include severe hypotension with acute myocardial infarction, cardiogenic dysrhythmia, electrolyte imbalance causing arrhythmia ... hypoxia causing a cardiac event,

13

head trauma of the fall itself, and other possibilities." Id. Dr. Pogue also notes that "[t]he pathologist concluded on the basis of microscopic cardiac and pulmonary findings, that: 'Taken together, these findings are most consistent with cardiopulmonary failure in the setting of long-standing myocyte injury, cardiovascular disease and decreased pulmonary reserve secondary to emphysematous changes and remote thromboembolic events.'" Id. citing Autopsy Report, Defs.' Ex. D at Page 2 of 6.

At the June 10, 2014 hearing, Dr. Pogue acknowledged that the focus of his practice was hematology/oncology and that, eventually, he devoted approximately 80 percent of his practice to hematology. Tr. 38:22-24, 40:6-10. He also conceded that he was not a forensic pathologist; that he was not board-certified in the field; that he had never practiced as a pathologist; and that he had never received any specific pathology training or published in the field. Tr. 43:19-44:6.

Although Dr. Pogue had not conducted any medical literature research in forming the opinions set forth in his report,[5] he asserted at the June 10, 2014 hearing that he had done so afterwards; however, he did not submit an amended or supplemental report. Tr. 49:4-12.

_____
5

Dr. Pogue's report was dated August 15, 2012; at the time of his deposition on February 20, 2014, he had not yet conducted any medical literature research on this case.

According to the invoice Dr. Pogue submitted for his services, he spent fifteen minutes on reviewing what he believed to be the full autopsy report. Tr. 66:8-11. That pathology report, under Section VII. Central Nervous System, notes that the brain showed "no external evidence of intra cranial bleed." It also specifically directs the reader to "[s]ee separate Neuropathology Procedure." Autopsy Report, Defs.' Ex. D at Page 1 of 6. Dr. Pogue conceded at the June 10, 2014 hearing that he did not request the neuropathology procedure section to the report; that his records do not reflect as to when he received that section; and that his expert report makes no reference to it. Tr. 70:22-71:15. Dr. Pogue also agreed that he still held the same opinion he formed when he thought he had reviewed the complete autopsy report (which was missing the neuropathology procedure section).

When questioned by Morris's counsel at the June 10, 2014 hearing, Dr. Pogue asserted that Mrs. Morris had "an untoward event, orthostatic hypotension, she fell striking her head, and that proved to be a fatal injury," which constituted an opinion that was disclosed neither in Dr. Pogue's expert report nor at his deposition. Tr. 23:9-12. He also stated, for the first time, that "[i]n reviewing the neural part of her autopsy report, there is evidence of brain damage. There's evidence of brain swelling.

I take that to represent the injury, the consequence of the injury she had when she fell." Tr. 4-8.

The discharge summery Dr. Pogue reviewed specified that "the patient was found to have suffered a presumptive mechanical fall." Although there was no witness to that event, Dr. Pogue disagreed with the statement, suggesting instead that Mrs. Morris fell as the result of orthostatic hypotension. Tr. 31:6-14. He offered no further explanation, however, how he arrived at that conclusion. Dr. Pogue also acknowledged that there was nothing in the records, on which he relied, that indicated the fall itself produced a physical injury that was the precipitating cause of death. Tr. 81:9-19.

In essence, Dr. Pogue briefly reviewed the medical records he was provided, including the incomplete autopsy report–which referred to, but lacked, the neuropathology procedure section—and fashioned a report in which he discussed a number of possible causes of death. It is undisputed, however, that neither the autopsy report, nor any of the other materials on which Dr. Pogue relied, established an anatomic cause of death. Dr. Pogue concedes in his report that there is "an absence of an evident anatomic cause of death," but he opines, nevertheless, that "the conclusion must be that an abnormal physiologic event caused her death." Id. at page 16 of 19.

Dr. Pogue acknowledges in his report that "the possibility of cardiogenic dysrhythmia or hypoxia could not be ruled in or out at the present because there was no measure of her oxygenation at the time of death." Id. Nevertheless, Dr. Pogue was prepared to opine that the cause of Mrs. Morris's death was head trauma as a result of her fall. Id. Regarding Dr. Pogue's qualifications to render such an opinion, Morris generally asserted that Dr. Pogue relied "on his experience as a medical doctor and on the autopsy report." Id. at 7. However, while it is apparent that the fall chronologically preceded Mrs. Morris' death, Dr. Pogue did not establish which of the "possibilities" listed in his report was the actual cause of death; nor did he explain how he arrived at the opinions he offered. Likewise, his new suggestion at the June 10, 2014 hearing that Mrs. Morris died as a result of the fall because the neuropathology report shows evidence of brain damage, is not contained in Dr. Pogue's expert report, nor is it supported by the neuropathology report itself.

More importantly, Dr. Pogue never explained the scientific methodology he employed that would allow him to arrive at conclusions different from those presented in the autopsy report and/or other materials he reviewed. For example, Dr. Pogue disagreed with conclusions drawn by the pathologist, which were based on the pathologist's review of microscopic slides generated

in connection with the autopsy. Tr. 95:1-3. Dr. Pogue conceded, however, that he was not competent to read the slides. Tr. 91:3-12. Dr. Pogue ultimately concluded that there was an "unknown physiologic event" that let to Mrs. Morris's death but, although he maintained that opinion, he could not state, to a reasonable degree of medical certainty, what the cause of that event was. Tr. 100:24-101:6.

In sum, Dr. Pogue did not perform the research and analysis that would allow him to render the conclusive opinion Morris seeks to proffer in support of her claims. Instead, Dr. Pogue conducted a cursory review of Morris's medical record, including the incomplete autopsy report (not realizing that it was incomplete and without requesting the missing neuropathology procedure section). He did not conduct any medical/scientific literature research until after he had completed his report and given his testimony at deposition and, although he now states that such literature supports his conclusions, he failed to amend or supplement his report accordingly. Dr. Pogue's ultimate conclusion as to Mrs. Morris's cause of death—which he concedes he cannot assert with the requisite certainty—is a collection of several possibilities, none of which are supported by detailed explanations or reference to the autopsy report or Mrs. Morris's medical record overall. Accordingly, because the <u>Daubert</u> standard

has not been met in this case, the Defendants' motion to preclude Dr. Pogue from offering an expert opinion on the cause of Mrs. Morris's death is granted.

With respect to Dr. Pogue's opinion about the standard of nursing care Mrs. Morris received at RIH, no lengthy discussion is warranted. In his report, Dr. Pogue generally opined that Nurse Gomes was negligent in leaving Mrs. Morris unattended while disposing of wet towels; that this breached the standard of medical care; and that RIH breached the standard of care by not providing a medically safe environment for its patients. Pogue Report at Page 17 of 19, (Dkt. No. 1), Pltf.'s Ex. 4.

Although it is not a requirement that an expert witness practices in the area in which he or she seeks to offer an opinion, the witness must have the appropriate "knowledge, skill, experience, training, or education," to qualify as an expert in the field of the alleged malpractice. R.I. Gen. Laws §9-19-41[6];

---

[6]

R.I. Gen. Laws §9-19-41 provides as follows:

In any legal action based upon a cause of action arising on or after January 1, 1987, for personal injury or wrongful death filed against a licensed physician, hospital, clinic, health maintenance organization, professional service corporation providing health care services, dentists, or dental hygienist based on professional negligence, only those persons who by knowledge, skill, experience, training, or education qualify as experts in the field of the alleged malpractice shall be permitted to give expert testimony as to the alleged malpractice.

*Foley v. St. Joseph Health Services of Rhode Island*, 899 A.2d 1271, 1280 (R.I. 2006)(noting that nothing in the plain and unambiguous terms of R.I. Gen. Laws §9-19-41 "requires an expert in a medical malpractice case to practice in the same specialty as the defendant or have training in the same medical specialty as the defendant."). However, prior to rendering an opinion, the expert "must still first demonstrate to the trial justice his or her particular knowledge acquired through education or experience in the field of alleged malpractice." *Debar v. Women and Infants Hosp.*, 762 A.2d 1182, 1188 (R.I. 2000). Accordingly, "'[m]ore than a casual familiarity with the specialty of the defendant physician is required,'" and the witness's opinion as to the conformity of the defendant's conduct must be based on "'knowledge acquired from experience or study of the standards of the specialty of the defendant physician.'" *Id.* (quoting *Fitzmaurice v. Flynn*, 356 A.2d 887, 892 (Ct. 1975)).

Here, Dr. Pogue readily acknowledged that he has never worked as a nurse and that he has no education, training, or experience in the field of nursing. Pogue Depo. Tr. (Feb. 20, 2014) at 41:2-6 (Dkt. No. 44-1). He also conceded that he had never reviewed the RIH nursing policy related to fall protection or fall risk assessment (or the policy of the Hospital of Central Connecticut, where Dr. Pogue was employed from 2003 to 2010 and

for most of 2013). Id. at 46:18-47:13. Dr. Pogue did not conduct any medical literature search in formulating his opinion, id. at 40:22-41:1, nor did he request or review the deposition testimony of Nurse Gomes in this case. Id. at 43:10-17.

Dr. Pogue's interaction with nurses was limited to "routinely" dealing with them in the course of caring for his patients; supervising nurses in the infusion section of the hematology/oncology department at the Connecticut hospital; employing nurses in his private practice; and giving individual instructions to nurses who were caring for his patients. Tr. June June 10, 2014 Hrg. Tr. at 10:17-24, 11:2-5, 11:10-14, 13:7-18.

In sum, Dr. Pogue had neither the expertise, training, and experience to testify regarding the standard of nursing care generally, nor did he perform any research or analysis to offer an expert opinion on the nursing care provided by Nurse Gomes or the policy and standards implemented by RIH. For those reasons, the Defendants' motion to preclude Dr. Pogue from testifying as an expert witness on this issue is granted.

### B. Umeugo

Umeugo, who has been working as a registered nurse since 2007 (Dkt. No. 47-2 at page 18 of 20), was sworn in as a member of the Connecticut bar in 2010 and has since been employed as an associate attorney in her father's law firm on a part-time basis.

Id. According to her testimony at the June 10, 2014 hearing, Umeugo did not perform the intake on Morris's case, but she reviewed the medical records to assess the nursing standard of care. She then prepared a report dated October 3, 2012, the day before Morris filed suit. (Dkt. No. 47-2 page 4 of 20). Umeugo conceded that, at the time of her deposition on March 13, 2014, she testified that had not been paid for her services and that she intended to bill the matter out of the proceeds of any recovery "when the case [came] to fruition." Tr. June 10, 2014 at 127:20-12:17. Umuego also acknowledged that the law firm had taken Morris's case on a contingency basis. Tr. at 139:9-15.

According to Umeugo, on June 3, 2014, after the final pretrial conference—at which the Defendants' motion to exclude her testimony was discussed in some detail—Umeugo prepared a bill for her work on the case. Ex. G. Umeugo explained that, after talking to her briefly about the Defendants' motion to disqualify her testimony, her father suggested to her that she should submit a bill. Tr. 134:12-135:22. Umeugo testified that she prepared the bill later that night on June 3, 2014, after which the bill was mailed to Morris. Tr. 139:18-25. In response, (according to Umeugo, possibly on June 7, 2014), Umeugo received a money order dated June 4, 2014. Ex. H. Tr. 136:4-18.

The Defendants seek to exclude Umeugo's expert testimony

regarding the standard of nursing care on the ground that Umeugo's compensation as an expert is contingent on the outcome of the case. Relying on <u>Crowe v. Bolduc</u>, 334 F.3d 124 (1st Cir. 2003), the Defendants argue that "an expert witness may not collect compensation which by agreement is contingent on the outcome of a controversy," Defs.' Mot. at 3 (Dkt. No. 43). The circumstances and timing of Umeugo's invoice (mailed after Umeugo prepared it late in the evening on June 3, 2014, following the final pre-trial conference at which the matter was discussed at length) and Morris's subsequent payment for Umeugo's services (by money order dated June 4, 2014) give the Court pause. Nevertheless, the Court is of the opinion that the proper approach to ensure the veracity of this witness is not exclusion, but rigorous cross-examination.

In <u>Crowe v. Bolduc</u>, a property transfer case, Crowe, the transferor-plaintiff, called on two attorneys (who had represented Crowe in the disputed transaction) to testify to the intent of certain agreements between the parties. <u>Crowe v. Bolduc</u>, 334 F.3d at 130. Crowe also requested that the trial court prohibit cross-examination of the attorneys regarding the contingent fee basis on which their firm represented Crowe. <u>Id.</u> Crowe's request was granted by the magistrate judge.

On appeal, although the magistrate judge's decision was

ultimately affirmed, based on the magistrate judge's finding of possible jury confusion, the First Circuit held that the two other stated grounds for exclusion of testimony on cross-examination were in error.[7] In its opinion, the First Circuit acknowledged that "[t]he majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy," id. at 132, noting that "[t]hat rule was adopted precisely to avoid even potential bias." Id. (listing cases). The Crowe Court also recognized that "Maine enforces this policy in part by a Bar Rule which prohibits the hiring of witnesses on a contingent fee basis." Id.; Maine Bar Rule 3.7(g)(3). The issue in Crowe, however, was not whether the attorneys should have been permitted to testify at all—in fact they did and, although they were not called as expert witnesses, they "gave what amounted to opinion testimony..." Crowe v. Bolduc, 334 F.3d at 132. Instead, the issue was "whether a restriction on cross-examination for bias as evidenced by a contingent fee agreement on the ground that the witnesses are attorneys is appropriate." Id.

As previously explained by the First Circuit in United

<hr />

[7]     The magistrate judge found that (1) there was no evidence that the attorneys would color their testimony because of their firm's financial interest in the case; and (2) unlike other witnesses, attorneys are ethically bound to testify truthfully. Crowe v. Bolduc, 334 F.3d at 131.

States v. Cresta, "[w]hile the risk of perjury is recognized, courts have chosen to rely upon cross-examination to ferret out any false testimony." United States v. Cresta, 825 F.2d 538, 546 (1st Cir.1987)(considering the interaction between "permitted testimony of a witness paid in a contingent fee basis and opportunity to cross-examine," Crowe at 132). To ensure the veracity of the witness "the jury must be informed of the exact nature of the contingency agreement; the defense counsel must be permitted to cross-examine the witness about the agreement; and the jury must be specifically instructed to weigh the witness' testimony with care." Crowe v. Bolduc, 334 F.3d at 133; but see Gediman v. Sears, Roebuck & Co., Civ. A. No. 76-3456-Z(A), 484 F.Supp. 1244 (D.Mass. Feb. 20, 1980)(stating that "[t]he assistance a jury is to receive from expert opinion should not be tempered by the need to speculate how much of a discount to allow for personal interest . . . [a]n agreement to give an opinion on a contingent basis . . . attacks the very core of expert testimony.").

At her March 13, 2014 deposition, Umeugo stated that she had not been paid for her services in this case (reviewing Mrs. Morris's medical file and issuing a report on October 3, 2012) and that she had not yet presented a bill. Depo Tr. March 13, 2014 40:1-7. Umeugo explained that she intended to bill for her

time "[w]hen the case comes to fruition," id. at 40:13-24, and agreed that she intended "to bill out of the proceeds of any recovery received in this case." Id. at 40:25-41:2.

At the June 10, 2014 hearing, Umeugo further explained that "what I meant was when the case was over, I would then bill." Tr. June 10, 2014 at 133:22-23. Umeugo maintained that she "wasn't told to prepare the bill," but that she did so on her father's suggestion after the final pretrial conference[8] that, perhaps, she should bill. Id. at 134:12-18. According to Umeugo, her father "went in very brief about the motion to disqualify about billing, so he said, just bill," after which she typed up the bill. Id. at 135:13-22.

In light of Umeugo's somewhat ambiguous statements regarding her intentions to bill for her services and the fact that she now has submitted an invoice and received payment from Morris, it has not been clearly established that payment for Umeugo's services is contingent on the outcome of this case. On the other hand, it is undisputed that Umeugo & Associates, P.C. has undertaken Morris's claims on a contingency basis and that the success of

---

[8]
    Questions to Umeugo by Defendants' counsel and statements in Defendants' supplemental memorandum (Dkt. No. 67) indicate counsel's understanding that the final pretrial conference took place on June 4, 2014. As set forth on the Court's docket, that conference took place on June 3, 2014. According to Umeugo's testimony, she prepared the bill later in the day on June 3, 2014, after the conference had taken place. Id. at 134:19-21.

the case depends, at least in part, on the expert testimony proffered by Umeugo, who is also an associate in the law firm representing Morris. Nevertheless, the Court is of the opinion that, in the absence of a state regulation and/or controlling case law to the contrary, the better approach is to explore the potential of witness bias through vigorous cross-examination at trial, rather than by complete exclusion. This determination is not inconsistent with the holding in <u>Crowe v. Bolduc</u>, 334 F.3d at 133. Accordingly, the Defendants' motion to exclude Umeugo's expert testimony is denied.

## Conclusion

For the foregoing reasons, the Defendants' motion to exclude the expert testimony of Dr. Pogue pursuant to <u>Daubert</u>, both with respect to cause of death and standard of nursing care, is GRANTED. The Defendants' motion to exclude the expert testimony of Umeugo is DENIED.

SO ORDERED.


/s/ Mary M. Lisi

Mary M. Lisi
United States District Judge

July 7, 2014